# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 3150 | DATE | 01/05/2004 |
| CASE TITLE | Morrisey v. Health Care Service Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment (Doc. # 10)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial [set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] . Enter Memorandum Opinion and Order. For the attached reasons, HCSC's Motion for Summary Judgment is GRANTED. In addition, counsel for HCSC is directed to show cause, within thirty days from the date of this order, why it should not be sanctioned for violating Fed. R. Civ. P. 11(b)(2).

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |
| JHC | courtroom deputy's initials |

number of notices

date docketed: JAN 0 7 2004

docketing deputy initials

date mailed notice

mailing deputy initials

Document Number

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT MORRISEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 02 C 3150 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| HEALTH CARE SERVICE CORPORATION | ) |
| A Mutual Legal Reserve Company, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Robert Morrisey worked for Health Care Service Corporation (HCSC) as a Programmer Analyst in the Blue Chip division. Morrisey was terminated on October 3, 2001 and then sued HCSC, alleging that it violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111, *et. seq.* when it terminated him and also when it failed to accommodate his disability. HCSC moves for summary judgment.

### I. Factual Background

HCSC is a Mutual Reserve Legal Company that writes and administers health and dental insurance business throughout the states of Illinois and Texas. In 1996, HCSC hired Robert Morrisey to be a Programmer Analyst and assigned him to the Eligibility area within HCSC's Blue Chip Division. In 1997, HCSC promoted Morrisey to the position of Senior Programmer Analyst within the Eligibility group. As a Senior Programmer Analyst, Morrisey designed and programmed computer systems, wrote programs, tested and debugged programs, and resolved technical problems related to those programs. When Morrisey began at HCSC, his manger and immediate supervisor

1

was Winona Cutright-Stiff and his senior manager was Eileen Fissinger. In October 1999, Filmore Burke became Morrisey's immediate supervisor and Morrisey also began working directly with Valetta Robertson, one of two "team leaders" under Burke.

Morrisey had been diagnosed with multiple sclerosis (MS) in 1993, three years before he began working with HCSC. Morrisey's MS affects his ability to walk and he needs the assistance of a cane to walk. Morrisey's MS also limits his ability to use his left hand. Even though Morrisey's MS limits his ability to walk and use his left hand, he can still participate in sports that do not require balance and adequately perform office tasks, such as typing, that his job requires. Despite the fact that he had already been diagnosed with MS, Morrisey informed HCSC on his application that he was not disabled and had no disability that would require an accommodation. Indeed, Morrisey never informed Burke, or any of his other supervisors, that he suffered from MS. Although Burke was aware that Morrisey used a cane to assist him in walking, Morrisey never told anyone at HCSC that he was limited in doing his job because of his MS. Instead, he told Burke that working more than eight hours per day was difficult for him (though he did not indicate that it was because of his MS).[1]

In late 1999, Morrisey's behavior at HCSC became problematic. For example, Morrisey refused to consult and communicate with coworkers. In one instance, Morrisey inserted an unauthorized code into a program, without informing coworkers, ultimately causing a program

---

[1] In describing the limits placed upon him by his MS, Morrissey relies heavily on a "Telephone Dictation Report" of Dr. Daniel Wynn. As HCSC notes, this evidence is inadmissible because Morrisey has failed to authenticate the document or provide a foundation for its admissibility. Indeed, the report is not even signed. The Court shall not rely on it for the purposes of resolving this motion. *See Bombard v. Fort Wayn Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1992).

2

outage. Another time, Morrisey made changes in a code after the customer had already approved the original code. But Morrisey's failure to communicate shortly became the least of his behavioral problems. He began to engage in vulgar and disruptive behavior. Morrisey would use profanity and other inappropriate language at work in public work areas. Morrisey also was belligerent towards Robertson, his team leader. For example, when Robertson inquired into Morrisey's progress on an assignment, he responded by yelling and cursing at her. Additionally, Robertson, who is African American, complained that Morrisey made antagonizing, racially-charged remarks to her, claiming that he informed her that "white is right." When Burke confronted Morrisey regarding the statement, Morrisey, rather than apologize for or deny making the remarks, instead explained that he grew up in a town like "Mayberry, R.F.D., where he was never taught to hate."

Throughout 2000, Burke and Cutright-Stiff repeatedly counseled Morrisey regarding his belligerent, uncooperative, insensitive, and rude behavior and informed him that his behavior needed to improve. Morrisey informed his supervisors during these meetings that his stress was to blame for his unacceptable behavior. By Morrisey's 2000 performance review (conducted in October 2000), his belligerence had infected his relationships with coworkers, management, and even customers. Burke, Cutright-Stiff, and Fissinger discussed whether they should place Morrisey on probation at that time, but Burke stated that he wanted to continue work with Morrisey on improving his behavior, so they opted not to place him on probation. Instead, at the performance review, Burke informed Morrisey that HCSC had received numerous complaints about his behavior from coworkers and customers and warned him that unless his behavior improved he would be placed on probation.

Burke also informed Morrisey that his interpersonal skills were very weak, that his behavior in interacting with other team members was only marginally acceptable, and that he needed to improve his communication skills.

Despite Burke's admonition, Morrisey's behavior worsened. In December 2000, he yelled and swore at Robertson. Cutright-Stiff counseled Morrisey and urged him to improve his behavior towards coworkers. Morrisey did not. On March 1, 2001, Morrisey sent Cutright-Stiff, Burke, and Robertson an electronic mail (e-mail) with the subject heading "What puts the DIS in dysfunction." The e-mail consists of 19 lines, accusing his coworkers of plotting against him. It begins, "This is a matter of corporate compliance. I am attempting to do the 'RIGHT' thing by addressing it with management first. I am finding this difficult due to my attitude toward 'political correctness.'" Later, Morrisey writes that "This is my version of what happened. It is of course subject to interpretation. I am interested in one view. Mine. Yesterday on our my [sic] way to a National Carrier meeting Valetta and I passed Pat Ward. Pat suggested to Valetta that they go somewhere together. Valetta indicated she was going to a meeting. Pat's message back was poor soul. What a dreary thing with such a nerd. Valetta's response indicated agreement. Much of the communication was non verbal where over 80 percent of communication takes place." As a result of the e-mail, Morrisey met with Cutright-Stiff and Burke on March 5. At the meeting, Burke placed him on a Corrective Action Plan, detailing areas in which Morrisey needed to improve and setting specific goals for him to meet. HCSC uses Corrective Action Plans as a preliminary step prior to termination.

Morrisey's behavior worsened despite the Corrective Action Plan and he continued to antagonize his coworkers. On June 11, 2001, Robertson asked Morrisey about his availability the following day for a meeting, and he told her to "shut up." The following day, during the meeting,

4

Morrisey made another racially insensitive remark. A customer complained to Cutright-Stiff, informing her that Morrisey had alluded to her dress and said "white is right" and that she was highly insulted. Morrisey does not deny that a customer was insulted by his comment, but suggests that she misheard him because he stated "the lady in white is right."

That afternoon, Morrisey met with Cutright-Stiff and Burke yet again to discuss his behavior. Morrisey was told that his behavior at the meeting and towards Robertson the day before was unacceptable. Cutright-Stiff and Burke placed Morrisey on probation, and Burke wrote a second Corrective Action Plan on June 15, 2001. This plan required Morrisey to refrain from engaging in disruptive and inappropriate behavior and made it clear that he would be terminated if his behavior did not improve. Morrisey met with Burke on July 13, 2001, for a performance evaluation not related to the Corrective Action Plan. At that performance evaluation, Morrisey received marks of "below-threshold" for his communication and team participation skills.

The final straw for HCSC occurred in September 2001. On September 19, 2001, the Blue Chip division was preparing a customer's business release, which was set for production on the following day. On the afternoon of September 19, the customer notified Robertson that it experienced a discrepancy in the code. Robertson and the customer consulted with Morrisey regarding the discrepancy, and he speculated that the problem might be that the program was using the wrong files, rather than a problem with the program's code. Robertson instructed Morrisey to verify his speculation before he left that evening. Morrisey, however, left work without verifying his theory and without informing anyone that he had failed to investigate the cause of the discrepancy. As it turned out, the discrepancy was due to a data entry error (made by HCSC employee Greg Yeager) in the source code, and when the program was launched on September 20,

it failed, causing a four-hour outage for the customer. As a result of the outage, Fissinger requested a written explanation of the events leading to the outage from everyone associated with the program. Morrisey offered no explanation why he left work without completing his investigation or without informing his team leader (Robertson) or the customer that he had not yet verified his "bad files" theory.

After the program outage, Cutright-Stiff, Burke, and Fissinger determined that Morrisey's failure to communicate with his coworkers accompanied by his failure to improve his behavior despite several warnings and two Corrective Action Plan's warranted his termination. Burke and Cutright-Stiff met with Morrisey on October 3, 2001, and informed him of his discharge.

## II. Standard of Review

Summary judgment is appropriate only when the record, viewed in the light most favorable to the non-moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The role of this Court is to determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III. Analysis

Morrisey's Complaint alleges that HCSC violated the ADA when it: 1) harassed him because of his disability; 2) discharged him because of his disability; and 3) "constructively replaced [him] by redistributing his duties. In its Motion for Summary Judgment, HCSC recasts Morrisey's

6

confusing claims as: 1) a hostile environment claim; 2) a discriminatory discharge claim; and 3) a failure to accommodate claim. Morrisey's response makes it clear that he did intend to raise a failure to accommodate claim (and not a constructive discharge claim).

*A.     Hostile Environment*

HCSC claims it is entitled to summary judgment on Morrisey's hostile environment claim because "the Seventh Circuit has stated . . . that a claim for hostile environment harassment is not cognizable under the ADA." (Def. Mem. in Support of Summ. J. at 14). In support the HCSC points to *Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999). But *Silk* stands for no such proposition. Instead, *Silk* expressly holds open the possibility that hostile environment claims are cognizable under the ADA. *Silk*, 194 F.3d 804 ("We shall proceed on the assumption that a hostile work environment claim is cognizable under the ADA."); *see also E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000) (proceeding under assumption that hostile work environment claim is cognizable under the ADA, but not affirmatively resolving the issue); *Vollmert v. Wisconsin Department of Transportation*, 197 F.3d 293, 297 (7th Cir.1999) (same). HCSC's blatant misrepresentation of Seventh Circuit precedent arguably runs afoul of Rule 11, which among other things requires that "the claims, defenses, and other legal contentions [in motions submitted to the court] are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2). HCSC makes no argument that the Court should adopt the rule that hostile environment claims are not cognizable under the ADA. Moreover, Local Rule 83.53.3(a)(1) prohibits lawyers from making "a statement of material fact or law to a tribunal which the lawyer knows or reasonably should know is false." The Committee Comment to Local Rule 83.53.3 informs attorneys that "[l]egal argument based on

7

a knowingly false representation of law constitutes dishonesty toward the tribunal." Even a cursory glance at *Silk*, or any other of several cases standing for the same proposition, would have informed counsel that the position it took was incorrect. Instead, counsel for HCSC flaunted the rules of civil procedure by misrepresenting the holding of *Silk*. Pursuant to Fed. R. Civ. P. 11(c)(2) the Court directs Counsel for HCSC to show cause within 30 days why it should not be sanctioned for violating Fed. R. Civ. P. 11(b)(2).

The Court, however, need not decide whether hostile environment claims are cognizable under the ADA because Morrisey abandoned this claim by failing to respond to Defendant's argument. Morrisey points to no evidence to demonstrate that he was harassed, intimidated, ridiculed, or insulted because of his disability, much less that the harassment was so severe that it created an abusive working environment. Accordingly, the Court GRANTS summary judgment in favor of HCSC with regard to Morrisey's hostile environment claim.

*B.     Discriminatory Discharge*

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability ... in regard to ... [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may overcome a defendant's summary judgment motion in an employment discrimination case by using either the direct method or the indirect method. *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000). Under the direct method, evidence that the employer discriminated against the employee based on his disability can be shown with either direct or circumstantial evidence. *Id.* Such evidence must demonstrate that the employer was motivated by an illegal employment criterion. *Id.*; *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000). Morrisey offers no evidence, direct or circumstantial, to

8

demonstrate that the decision to terminate him was motivated by his disability and makes no argument regarding the direct method, and so must proceed under the indirect, burden shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the burden-shifting method, a plaintiff first must establish a prima facie case of discrimination by her employer, which creates a presumption of intentional discrimination. *McDonnell-Douglas Corp.*, 411 U.S. at 802-04; *Bekker*, 229 F.3d at 672. The burden of production then shifts to the employer to offer a non-discriminatory reason for the employment action. *McDonnell-Douglas Corp.*, 411 U.S. at 802-04; *Bekker*, 229 F.3d at 672. Once the employer has proffered a legitimate reason, the inference of discrimination disappears, and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was a pretext for intentional discrimination. *McDonnell-Douglas Corp.*, 411 U.S. at 802-04; *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 626-27 (7th Cir. 2001). To establish a prima facie case of discrimination, a plaintiff must show that he was: 1) a qualified individual with a disability; 2) that his work met the legitimate expectations of the defendant; 3) that he suffered an adverse employment action; and 4) that he was treated differently than a similarly situated employee. *Pugh*, 259 F.3d at 626.

Morrisey cannot establish a prima facie case because he can not demonstrate that he was meeting HCSC's legitimate expectations or that similarly situated employees outside the protected class were treated more favorably. Morever, even if Morrisey could establish a prima facie case, he cannot demonstrate that HCSC's reason for firing him was pretextual.

Morrisey failed to meet the legitimate expectations of HCSC. In the two years prior to his termination, Morrisey repeatedly abused, berated, insulted, and demeaned his coworkers and

9

supervisors. When assigned tasks, he told his supervisors to "shut up." He made racist remarks to coworkers. Customers complained to HCSC that he made racist remarks. He sent incendiary emails to his supervisors claiming that his coworkers were plotting against him. He refused to communicate with his coworkers, which often led to program outages. He used loud, vulgar language in public work spaces. Moreover, HCSC gave Morrisey multiple opportunities to correct his rude, insensitive, and obnoxious behavior. In October 2000, Burke informed Morrisey during a performance review that his behavior needed to improve before resorting to HCSC's disciplinary procedure of implementing a Corrective Action Plan. When Burke's efforts failed to help Morrisey improve his behavior, HCSC implemented not one but two Corrective Action Plans, detailing specific goals for Morrisey to achieve regarding his behavior. Despite HCSC's efforts, Morrisey's behavior only got worse. And in September 2001, his inability to communicate with his coworkers and supervisors caused a four-hour outage for a customer. Morissey's two-year history of belligerent, anti-social, and abusive behavior more than establishes that he failed to meet HCSC's legitimate expectations.

Morrisey states, without factual support, that despite all of his behavioral problems, that he "was also performing his duties to the reasonable expectation of the Defendant." According to Morrisey, he "successfully completed" the Corrective Action Plans and therefore demonstrated he was meeting his employer's expectations. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6-7). But the mere fact that Morrisey's probationary period ended does not mean that he was meeting HCSC's legitimate expectations. Indeed, the contrary is true—Morrisey's behavior continued to worsen after the Corrective Action Plans ended. HCSC expected that Morrisey treat his coworkers with respect and that he communicate with them in order to complete his job. Indeed, HCSC's Employee Code requires its employees to treat each other with "honesty, dignity, and respect." But for more than two

10

years Morrisey repeatedly failed to afford his coworkers simple courtesy and respect, and ultimately HCSC tired of giving him second chances to improve his behavior. It was not obligated to implement yet another Corrective Action Plan and hope to catch Morrisey misbehaving while on probation in order to terminate him.

Morrisey explains the September 2001 outage was caused by a data-entry error by another employee and therefore cannot demonstrate that he failed to meet HCSC's legitimate expectations. But Morrisey's job description required him not only design programs, but also test them and correct technical problems. It makes no difference that Yeager was also culpable for the September 2001 outage. Morrisey was instructed by his supervisor to test the program and determine definitively the cause of an error. He failed to do so and instead only theorized (incorrectly) as to what the problem was. As a result of Morrisey's guesswork and failure to take the necessary steps to determine with certainty the cause of the error, the program failed when it was launched. He did so despite instructions from a supervisor to do otherwise, and thus plainly did not meet HCSC's legitimate expectations. Regardless of the spin Morrisey places on his job description, it is not the Court's business to decide whether HCSC expected too much from Morrisey. *See Robin*, 200 F.3d 1081, 1090. The Court only asks whether Morrisey met those expectations, and his disciplinary record and failure to communicate with his coworkers regarding the September 2001 outage clearly demonstrate that he did not.

Even if Morrisey could show that he was meeting the legitimate expectations of HCSC, he cannot prove that he was treated differently than a similarly situated employee. Morrisey offers Yeager, who made the data entry error which was the source of the September 2001 outage, as a comparator. Morrisey argues that Yeager was not discharged, and thus was treated more favorably.

11

But Yeager was not a similarly situated employee. To show that another employee is similarly situated, a plaintiff must show that there is someone who is comparable to him in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Morrisey had an extensive disciplinary history consisting of numerous verbal warnings and two Corrective Action Plans. Morrisey submits no evidence that Yeager had ever been disciplined. Employees who lack similar disciplinary history are not similarly situated because the employer's treatment of them can distinguished because of that history. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000); *see also Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 580 (7th Cir. 2003) (similarly situated employees must engage in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them). Morrisey points to no other potential comparators and so his claim also fails because he cannot identify a similarly situated employee outside the protected class who was treated more favorably.

Not only has Morrisey failed to establish a prima facie case of discrimination, but he also can not demonstrate that HCSC's reasons for discharging him were pretextual. Once HCSC has presented a legitimate, non-discriminatory reason for firing Morrisey, he must prove by a preponderance of the evidence that the reason for his termination was pretextual. *Dvorak v. Mostardi Platt Assocs.* 289 F.3d 479, 485 (7th Cir. 2002). To prove that HCSC's reasons were pretextual, Morrisey would have to offer evidence sufficient to demonstrate that HCSC's reason for discharging him was false—that it had no basis in fact, did not actually motivate the decision, or was insufficient to support the decision. *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002). In determining whether an employer's proffered reason for an employment action was pretextual, the court is not concerned with whether the employer made a bad decision, but rather the focus of the

12

inquiry is whether the employer honestly believed in the reason it offers. *See Dvorak*, 289 F.3d at 487 ("it does not matter whether the employer was ultimately wrong or unfair in the determination, nor whether a jury in the company's shoes would have fired him.")

In an attempt to demonstrate pretext, Morrisey again tries to shift blame for the September 2001 outage to Yeager. But as noted above, the mere fact that Yeager contributed to the September 2001 outage does not mean that HCSC did not honestly believe that Morrisey also contributed to it. Morrisey offers nothing, other than his own interpretation of his job responsibilities, to demonstrate that HCSC did not honestly believe that he was in part to blame for the September 2001 outage. Arguing about the accuracy of the HCSC's assessment of the culpability for the outage, however, is a distraction "because the question is not whether the employer's reasons for the decision are 'right but whether the employer's description of its reasons is *honest*.'" *Kariotis v. Navistar Int''s Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (quoting *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)) (emphasis in original). Morrisey has offered no evidence that HCSC did not honestly believe that he was in part to blame for the September 2001 outage. Moreover, HCSC also pointed to Morrisey's belligerent behavior, over the course of a two-year period. Morrisey again suggests that this cannot be the reason for his discharge because he "successfully completed" the probation.[2] But the probation was for a limited period of time—it ended. After it

---

[2] Although Morrisey makes no such argument in his brief in response to Defendant's motion for summary judgment, he attempts, throughout his 56.1(b)(3) statement of facts, to blame his behavioral problems on his MS. For example, Morrisey suggests that the reason he "exhibited dysfunctional behavior and used inappropriate language and was loud and vulgar . . . [was because] he suffers from MS, a degenerative disease, that directly affects his nervous system." Pl. 56.1(b)(3) Statement of Facts ¶ 24. But this is absurd. Symptoms of MS related to speech involve a difficulty in articulation, not a proclivity to make rude, racist, and insulting comments. *See, e.g., Handbook of Multiple Sclerosis* 627-28 (Stuart D. Cook, ed., 3d ed. 2001); *Blue Books of Practical Neurology: Multiple Sclerosis 2* 331-32 (W. Ian McDonald & John H.

13

ended, Morrisey's behavior did not improve, and nothing in the record suggests that HCSC was satisfied with Morrisey's interpersonal skills at the time of his discharge. the record clearly shows that HCSC believed the reasons it proffered for Morrisey's termination.

Morrisey can establish neither a prima facie case of discrimination, nor prove that HCSC's proffered reasons for his discharge were pretextual. Accordingly, the Court GRANTS summary judgment in favor of HCSC with regards to Morrisey's claim that he was discharged because of his disability.

*C.   Failure to Accommodate*

Morrisey's final claim is that HCSC failed to accommodate his disability. According to Morrisey, working more than eight hours a day, which caused him stress and exacerbated his MS. Under the ADA an employer must make "reasonable accommodations to the known physical...limitations of an otherwise qualified individual with a disability...." 42. U.S.C. § 12112(b)(5)(A) (2000). HCSC argues, among other things, that Morrisey is not disabled within the meaning of the ADA and therefore it was not required to give him an accommodation. The Court, however, need not answer this question for two reasons: (1) Morrisey never made his need for an accommodation known to HCSC; and (2) even if Morrisey's occasional complaints regarding his condition could be considered as requests for accommodations, HCSC did accommodate him.

Morrisey admits that he never explicitly asked HCSC for an accommodation, even though HCSC had a formal procedure to allow employees to make such requests. But more importantly, Morrisey himself admits that he never felt that he needed any accommodation. In his deposition, Morrisey admits that (1) he never felt he was limited in his ability to do his job and (2) that he never

---

Noseworthy eds., 2003).

told anyone at HCSC that he was limited in his ability to do his job. (Def. L.R. 56.1(a) Statement of Facts (Def. Statement), Ex. C (Morrisey Dep.) at 205-06). As a result, HCSC did not have notice that Morrisey needed an accommodation. *See Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 898-99 (7th Cir. 2000). It is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting there from. *Id.* Morrisey claims that on ten to twelve occasions he requested that HCSC not require him to work more than eight hours per day or allow him to leave work because he was in pain resulting from his MS. But isolated and sporadic requests to go home early or work a shorter day, particularly when such requests make no mention of Morrisey's MS, cannot be construed to be requests for accommodations. Even if these requests could be construed as requests for accommodations, the facts reveal that HCSC *granted* Morrisey's requests. In his deposition, Morrisey describes several instances when he approached a supervisor because he was "just physically tired, and . . . incapable of continuing to work," and each time his request was granted. (Def. Statement, Ex. C (Morrisey Dep.) at 185-187). As for working no more than eight hours per day, Morrisey identifies only one instance, in December 2000, during which he had to work more than eight hours per day, and after he talked with Burke regarding the incident, Morrisey points to no other incident for which he was required to work for more than eight hours. (Def. Statement, Ex. C (Morrisey Dep.) at 155-159; 185-187). The ADA requires that employers make *reasonable* accommodations to *known* physical limitations. To the extent that Morrisey himself believed that he did not need any accommodation and to the extent that HCSC willingly allowed Morrisey to leave work whenever he expressed discomfort caused by his MS, the Court finds that his failure to accommodate claim is without merit and GRANTS summary judgment in favor of HCSC.

IV. Conclusion

For the foregoing reasons, HCSC's Motion for Summary Judgment on all its claims is GRANTED. In addition, counsel for HCSC is directed to show cause, within thirty days, why it should not be sanctioned for violating Fed. R. Civ. P. 11(b)(2).

IT IS SO ORDERED.

1/5/04
Dated

The Honorable William J. Hibbler
United States District Court